## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN ALBERICI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RECRO PHARMA, INC., GERALDINE A. HENWOOD, RYAN D. LAKE, AND MICHAEL CELANO,<br><br>Defendants. | Case No. 2:18-cv-02279-MMB<br><br>**CLASS ACTION AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Michael M. Baylson<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff, the Recro Investor Group ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Recro Pharma, Inc. ("Recro" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Recro securities between July 17, 2017 through May 23, 2018, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officers/executives.

2.  Recro is a specialty pharmaceutical company that develops non-opioid therapeutics for the treatment of pain in the post-operative setting.

3.  Founded in 2007, Recro is headquartered in Malvern, Pennsylvania, and its securities trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "REPH."

4.  The Company's lead product is a proprietary injectable form of meloxicam ("IV meloxicam"), a long-acting preferential COX-2 inhibitor to be used for the management of moderate to severe pain.

5.  Recro announced that it filed a New Drug Application ("NDA") for IV meloxicam in July 2017, and the market buzzed with excitement with the hope that IV meloxicam would offer surgeons and their patients a long-lasting, once daily, non-opioid alternative drug to manage pain following surgery.

6.  Before and after the filing of the NDA, Defendants misled investors about the market for IV meloxicam.  Specifically, Defendants made numerous materially false and misleading statements that soft tissue surgeons, such as gastrointestinal/colorectal surgeons, and their patients were IV meloxicam target opportunities even though Defendants knew, but failed to disclose, that key opinion leader physicians told the Company that they were not impressed with the drug's analgesic effects for soft tissue procedures and it should not be used in soft tissue procedures.

7.     Defendants also misled investors to believe that, even though IV meloxicam was manufactured overseas, there was "oversight by our internal managers."   In reality, however, Recro did not have a handle on the manufacturing process.   The Company had only one employee, the Chief Executive Officer's brother hired as a result of nepotism, to oversee the manufacturing of IV meloxicam and its packaging in Ireland.   Although key opinion leader physicians voiced concerns to the Company about the quality and oversight of manufacturing IV meloxicam overseas, Recro did not disclose these concerns to investors.

8.     On May 24, 2018, Recro announced that the FDA had declined to approve Recro's NDA for IV meloxicam.   In its Complete Response Letter ("CRL") to the Company, the FDA stated that it is unable to approve the application in its current form "because data from ad hoc analyses and selective secondary endpoints suggest that *the analgesic effect does not meet the expectations of the FDA*."   Additionally, the CRL raised *chemistry, manufacturing and control-related "questions on extractable and leachable data* provided in the NDA."   (Emphasis added.)

9.     On this news, Recro's share price fell $6.79, or 54.67%, to close at $5.63 on May 24, 2018.

10.     As a result of Defendants' materially false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and § 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Recro's principal executive offices are located within this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

15.     Plaintiff acquired Recro's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Recro is incorporated in Pennsylvania, with principal executive offices located at 490 Lapp Road, Malvern, Pennsylvania 19355. Recro's securities trade on the NASDAQ under the ticker symbol "REPH."

17.     Defendant Geraldine A. Henwood ("Henwood") founded Recro in 2007 and has served as the Company's Chief Executive Officer ("CEO"), President and Director since 2008. She has served as a member of the Company's Management Team and Leadership Team at all relevant times.

18.     Defendant Stewart McCallum ("McCallum") has served as the Company's Chief Medical Officer since December 2015.  He has served as a member of the Company's Management Team and Leadership Team at all relevant times.

4

19.     Defendant John Harlow ("Harlow") has served as the Company Executive Vice President, Commercial since February 2018, and prior to that, served as Vice President, Marketing since October 2016.  He has served as a member of the Company's Management Team since February 2018 and Leadership Team at all relevant times.

20.     Defendant Michael Celano ("Celano") has served as the Company's Chief Financial Officer ("CFO") from July 2016 to January 2018, and served as its Chief Operating Officer since January 3, 2018.  He has served as a member of the Company's Financial Leadership Team since January 2018, and the Management Team at all relevant times.

21.     Defendant Ryan D. Lake ("Lake") has served as the Company's CFO since January 2018, and prior to that, served as Recro's Senior Vice President of Finance and Chief Accounting Officer from June 6, 2017 to January 2018.  He has served as a member of the Company's Financial Leadership Team since January 2018, and the Management Team at all relevant times.

22.     The Defendants referenced above in ¶¶ 17-21 are sometimes referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Recro's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations

being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Recro is a specialty pharmaceutical company that operates through two distinct business divisions that are reported as separate segments – (a) an Acute Care division; and (b) a Contract Development and Manufacturing Organization ("CDMO"), located in Gainesville, Georgia.

25.     The Acute Care division is primarily focused on developing products for hospital and other acute care settings.

26.     Recro's lead product candidate in its Acute Care division is IV meloxicam, a proprietary injectable form of meloxicam, a long-acting, non-opioid drug for the management of moderate-to-severe, acute postoperative pain.  Meloxicam is a preferential COX-2 inhibitor, a subclass of non-steroidal anti-inflammatory drugs.

27.     Recro purchased the rights to a patent-protected NanoCrystal® formulation of IV meloxicam and the CDMO facility from Alkermes Plc ("Alkermes") on April 13, 2015.

28.     In 2000, an oral meloxicam tablet (Mobic®) was approved by the FDA for signs and symptoms of osteoarthritis and rheumatoid arthritis, but it has a slow onset of action, largely due to poor water solubility, and is not currently approved for the treatment of acute pain.  Recro claims that its proprietary IV form of the drug provides a faster onset of action of meloxicam and a rapid and sustained treatment for acute pain via IV routes.

29.     Currently, opioids dominate the IV acute pain market.  Recro touts IV meloxicam as having the potential to overcome many of the significant complications and side effects

associated with commonly-prescribed opioid drugs, including addiction, respiratory depression, constipation, excessive nausea and vomiting.

30.     Recro is not an earnings-driven company.  The Acute Care segment does not earn any revenue and Recro relies upon cash flows from its CDMO facility to offset the cost of developing IV meloxicam.

31.     As IV meloxicam is the Company's lead product candidate in the Acute Care segment, the importance of getting the NDA approved cannot be overstated.

### It's a Family Affair - Nepotism Is Rampant at the Company

32.     Nepotism is rampant at the Company.   Henwood (the CEO, President and Director of the Company) uses Recro as an employment vehicle for her family members.

33.     For example, Henwood's brother, Chris Sharr ("Sharr"), has served as the Company's Vice President, Manufacturing and Alliance Management since January 1, 2017. Sharr received a salary of $243,000 in 2017 and was awarded options to purchase 43,600 shares of Recro common stock upon hire with a grant date fair value of $229,772.  Sharr has served as a member of the Leadership Team at all relevant times.

34.     Henwood's sister, Diane Myers ("Myers"), has served as Recro's Senior Vice President, Regulatory Affairs and Quality Assurance since 2014.  Myers earned $762,028 in total compensation in 2017.  Myers has served as a member of the Management Team and Leadership Team at all relevant times.

35.     Henwood's sister-in-law, Suzanne Sharr (Sharr's wife), has served as Recro's Senior Director of Human Resources since January 1, 2017.  Suzanne Sharr received a salary of $202,000 in 2017 and was awarded options to purchase 15,000 shares of Recro common stock upon hire with a grant date fair value of $79,050.

36.     While the Company disclosed that some of Henwood's family members were hired by the Company, investors had no idea that underqualified relatives were gifted and keeping positions at the Company.

37.     Key Opinion Leaders ("KOLs") are well-respected, expert physicians in their field who provide thought leadership to their peers and the general public.  They conduct research, write articles and/or speak on behalf of pharmaceutical and life-sciences companies. As physicians attempt to choose from a myriad of drug options for patients, they often turn to KOLs for knowledge and advice on specific drugs.  As a result of their years of industry experience and medical affiliations, KOLs possess a unique credibility and have become entwined with the marketing of pharmaceuticals to lend credibility to claims of efficacy and safety.

38.     Recro had a robust list of 200-300 KOL physicians for IV meloxicam (including orthopedic surgeons, general surgeons, gastrointestinal/colorectal surgeons, anesthesiologists, and other physicians), some of whom Recro relied upon to lend credibility to Recro's claims of efficacy and safety with respect to IV meloxicam.

39.     KOLs for IV meloxicam frequently communicated with Confidential Witness ("CW") No. 1 and CW1's Medical Affairs Team.  CW1 was employed at the Company as the Regional Medical Affairs Director from June 2017 through September 2017, and the National Director of Medical Affairs from October 2017 through May 2018.  CW1 was a member of Recro's Leadership Team.  He led and coordinated medical conferences attended by KOLs, the majority of which he personally attended.  At times, members of the Medical Affairs Team accompanied him to the conferences, depending on the location of the conference.  During such conferences, CW1 frequently spoke with Recro's KOLs.  CW1 also travelled to KOL facilities

8

where he personally spoke with Recro's KOLs.   The Medical Affairs Team and CW1 documented their interactions with KOLs and always reported their interactions to Recro's leadership, as described below.

40.     CW1 reported to McCallum, the Company's Chief Medical.   CW1 attended Leadership Team meetings every few weeks.   Leadership Team meetings were core team meetings during which updates and directions for IV meloxicam were discussed.   CW1 attended all of these meetings in person or by phone.   The meetings were attended by the following Leadership Team members: McCallum; Myers; Harlow; Sharr; Jim Witt, Director of Commercial Insights and Training; Cynthia Sherman, Vice President of Market Access; Fred Graff, Chief Commercial Office; Greg Gangemi, Vice President of Sales; Janeese Carter, Director of Marketing, Paul Baddeley, Director of Sales Operations and Analytics; and Libby Black, a consultant (hired as Senior Director of Global Health Outcomes in April 2018).   Randy Mack ("Mack"), Senior Vice President, Development, and a member of the Leadership Team, attended the meetings to the extent the meeting focused on clinical development.   Henwood, also a member of the Leadership Team, did not frequently attend Leadership Team meetings, but always received reports of these meetings from McCallum and Harlow, both of whom regularly interfaced with Henwood.

41.     Over the course of CW1's employment, at least 20 KOLs told CW1 that he or she had concerns about nepotism at the Company with respect to Henwood's family, and questioned whether Henwood's family members, including Sharr, were qualified for their respective positions at the Company.   In fact, CW1 stated that all eight members of the Medical Affairs Team, including CW1, had these concerns, as well as several members of the Marketing team.

42.     CW1 stated that he and his Medical Affairs Team reported at meetings to the Company's leadership that the KOLs had concerns about nepotism, qualifications of Henwood's family members, including Sharr and his oversight of manufacturing in Ireland (discussed herein), the lack of safety data on bleeding risks for IV meloxicam, and the lack of robust data concerning IV meloxicam's analgesic efficacy to convince soft tissue surgeons to use IV meloxicam in soft tissue procedures (discussed herein).

**The Company Filed a New Drug Application with the FDA**

43.     Recro conducted efficacy and safety clinical trials for purposes of filing an NDA for IV meloxicam with the FDA.

44.     In addition to conducting Phase 2 studies in acute pain models, the Company conducted randomized, double-blind, placebo-controlled Phase 3 acute post-operative pain studies, including a Phase 3 efficacy clinical trial in bunionectomy (hard tissue), a Phase 3 efficacy clinical trial in abdominoplasty (soft tissue), and a Phase 3 safety study.

45.     Although Recro disclosed that the primary endpoints were met in both the bunionectomy and abdominoplasty clinical trials, the efficacy data for the abdominoplasty (soft tissue) clinical trial was far less robust than the data for the bunionectomy (hard tissue) clinical trial according to KOLs and as further explained herein.

46.     The Company announced that it filed its NDA for IV meloxicam 30 mg on July 31, 2017 for the management of moderate to severe, acute postoperative pain.

47.     On September 28, 2017, the Company issued a press release announcing that the FDA had accepted for review its NDA for IV meloxicam 30 mg.

48.     On October 5, 2017, Recro announced that the FDA had set a PDUFA date of May 26, 2018 for its decision on the NDA.  PDUFA dates are deadlines by which the FDA must

review NDAs.  The Prescription Drug User Fee Act of 1992 or PDUFA typically calls for a period of 10 months to review such applications.

49.     Many drug companies choose to disclose their PDUFA dates in the hopes that doing so will lead to an increase in their share prices.  If the FDA approves a company's NDA on a breakthrough drug, its share price likely will climb as a result.  Similarly, share prices might also rise in anticipation of FDA approval.

### The Company Receives a Complete Response Letter from the FDA Rejecting Recro's NDA for IV Meloxicam

50.     In a May 24, 2018 Complete Response Letter ("CRL"), the FDA rejected Recro's NDA for IV meloxicam 30 mg.

51.     CRLs inform drug companies that the review cycle for an NDA has been completed and that the NDA is *not* approvable.  They lay out deficiencies and outline possible remedies.  CRLs can have a devastating effect on a small company's share value.

52.     CRLs are usually confidential.  The FDA does not release CRLs publicly prior to approval because of confidentiality concerns.

53.     According to Recro's May 24, 2018 press release, the CRL stated that the FDA is unable to approve the application in its current form "because data from ad hoc analyses and selective secondary endpoints suggest that the analgesic effect does not meet the expectations of the FDA."  Additionally, the CRL raised chemistry, manufacturing and control or "CMC"-related "questions on extractable and leachable data provided in the NDA."

54.     During a May 24, 2018 morning conference call, Henwood stated that "[t]o the best of our understanding right now, there is a lack of clarity in the reviewer's mind about some of the data."

55. Recro's share price was decimated as a result the news. The stock dropped from $6.79, or 54.67%, to close at $5.63 on May 24, 2018.

### Prior to Receiving the CRL, Defendants Likely Knew, But Failed to Disclose, the Reasons Why the FDA Would Not Approve the NDA

56. The FDA believes in transparency and communication with drug companies submitting NDAs. As such, after the FDA has accepted an NDA for review, the FDA will send information requests, raise further questions, have meetings, and may make recommendations to the drug company applicant. *When making a decision on an NDA, the FDA does not operate in a vacuum!*

57. Consequently, it is very likely that, prior to receipt of the CRL, Recro was aware of, but failed to disclose, the two issues raised by the FDA in deciding not to approve the NDA.

### KOLs Voiced Concerns to the Company about the Quality and Oversight of Manufacturing IV Meloxicam Overseas

58. The Company entered into various agreements for the manufacturing and packaging of IV meloxicam.

59. The Company (through its subsidiary – Recro Ireland Limited) is party to a July 10, 2015 Development, Manufacturing and Supply Agreement ("Supply Agreement") with Alkermes (through its subsidiary – Alkermes Pharma Ireland Limited), for the clinical and, if approved by the FDA, commercial supply of injectable meloxicam. Pursuant to the Supply Agreement, the Company purchased its clinical supplies, and agreed to purchase its commercial supplies, of bulk injectable meloxicam formulation exclusively from Alkermes, subject to certain exceptions, for a period of time; and Alkermes provided development services with respect to the Chemistry, Manufacturing and Controls section of the NDA for injectable meloxicam.

60.     On July 14, 2017, Recro announced that the Company, through its subsidiary Recro Ireland Limited, entered into a Master Manufacturing Agreement and Product Agreement with Patheon UK Limited to perform various manufacturing services, including providing sterile fill and finish services of bulk injectable meloxicam.

61.     CW1 stated that approximately 30% of KOLs expressed their concern to CW1 about IV meloxicam being manufactured overseas.  The KOLs were aware that "any blip on the radar" that the FDA finds in the manufacturing and packaging process could sink approval of the drug. When CW1 spoke to KOLs about FDA approval "the thing that kept coming back up over and over again . . . the thing they were concerned about was a potential packaging issue or manufacturing issue because the manufacturer was in Ireland."  "This was one of the things the KOLs were concerned about that would keep this product from being approved."  "It came up in conversations with surgeons many times – 'Let's hope there are no[ ] manufacturing problems.'"

62.     CW1 stated that the doctors' concerns were based on their experience with foreign manufacturing of drugs.  The KOLs expressed concern that a manufacturing plant in Ireland may not have the same standards as the U.S. which could cause the plant to fail the FDA pre-approval plant inspections.  As such, oversight of the manufacturing and packing process was all the more important.

63.     CW1 also stated that the KOLs had concerns regarding Recro's level and quality of oversight of the manufacturing process of IV meloxicam.  The department was not adequately staffed.  Recro had only one employee, Sharr, handling the oversight for manufacturing IV meloxicam and its packaging in Ireland.  But to be adequately staffed, the department needed a full-time person on the ground in Ireland to oversee manufacturing and a full-time person at the Company's Pennsylvania headquarters to handle in-house needs.  Sharr was based in

Pennsylvania, and went back and forth from Pennsylvania to Ireland, spending only some of his time in Ireland overseeing the manufacturing and packaging process of IV meloxicam.

64.     Moreover, as noted above, Sharr is Henwood's brother and the KOLs who were aware of the relationship raised additional questions and concerns that Sharr was not sufficiently qualified to oversee manufacturing.

65.     CW1 stated that "those were legitimate concerns" "and wham-o, one of the reasons it didn't get approved was this manufacturing defect . . . with the product leaching through the vial."

66.     CW1 stated that Sharr never struck CW1 as having a handle on manufacturing.  In early 2018, another issue arose regarding the package label and insert for IV meloxicam, which fell within Sharr's area of responsibility.  Even with this relatively small problem, Sharr's management of the issue "was chaotic."

67.     CW1 and CW1's Medical Affairs Team reported the KOLs' concerns regarding Sharr and foreign manufacturing of IV meloxicam to Recro's top leadership.  "That was reported to the Company, they knew."  "We reported all [of] that in our reports to corporate.  We had conversations with the Leadership Team about what physicians were saying."  CW1 confirmed that these concerns were provided to Henwood, McCallum, Harlow and Mack.

68.     Investors had no idea that Sharr did not have a handle on the manufacturing process for IV meloxicam and was in way deep over his head.

**Defendants Told Investors That Soft Tissue Surgeons and Their Patients Were "IV Meloxicam Target Opportunities" Even Though They Knew That KOLs Were Not Impressed with IV Meloxicam's Analgesic Effects for Soft Tissue Procedures and Stated That the Drug Should Not Be Used in Soft Tissue Procedures**

69.     CW1, who as stated above, frequently communicated with KOLs, documented their interactions, and reported their interactions to Company leadership, stated that Defendants

14

knew that while 99.9% of KOLs were convinced that IV meloxicam should be used in orthopedic procedures, Defendants also knew that *KOLs stated that IV meloxicam should not be used in soft tissue procedures* because the clinical trial data for the efficacy of IV meloxicam in hard tissue procedures (such as in the Phase III study in patients undergoing bunionectomy) was far more compelling than the clinical trial data for the drug's efficacy in soft tissue procedures (such as in the Phase III study in patients undergoing abdominoplasty procedures).  In clinical trials, IV meloxicam showed a much less significant reduction in pain (or analgesic effect) in soft tissue procedures than in orthopedic procedures.  Simply put, soft tissue clinical data was not as robust.

70.     Soft tissue procedures are usually less painful, so the range of pain reduction when using IV meloxicam is less dramatic.  For example, on a pain scale of 0 to10 where 10 is the worst pain imaginable, orthopedic (or hard tissue) surgery patients may rate their pain at an 8 after a procedure and before receiving painkillers.  For soft tissue procedures, however, the rating may be closer to a 5.  If you provide IV meloxicam and control the pain in both types of procedures to a 3, the range of pain reduction from 8 to 3 is much more impressive than a pain reduction from 5 to 3.

71.     Additionally, IV meloxicam's Phase III abdominoplasty trial missed 8 of 18 secondary endpoints, including the secondary endpoint of Patient Global Assessment of pain control as measured at hour 24.  Thus, the potential exists for patients to have insufficient analgesic coverage (or breakthrough pain) toward the end of the 24-hour interval between doses.

72.     CW1's Medical Affairs Team went into the field to develop relationships with doctors and particularly KOLs who might be interested in using and promoting IV meloxicam.

The Medical Affairs Team focused on this type of relationship-building during the first half of 2018, but the vast majority of their focus was on orthopedic surgeons, not soft tissue surgeons.

73.    Even though Defendants knew that soft tissue physicians were not a receptive market for IV meloxicam, Defendants made various false statements throughout the Class Period to convey to the market that soft tissue surgeons and their patients were "IV meloxicam target opportunities" for the Company.  But nothing could be further from the truth.

**Materially False and Misleading Statements Issued During the Class Period**

**Statements Issued During the Third Quarter of 2017 (July 1, 2017-September 30, 2017)**

74.    The Class Period begins on July 17, 2017, when the Company filed a Form 8-K with the SEC, signed by Henwood, along with a corporate investor presentation, attached as an exhibit, to be used by representatives of the Company "in various meetings with investors from time to time."  The investor presentation stated the following, in relevant part, with respect to soft tissue procedures (emphasis added):

*IV Meloxicam Target Opportunity*

*Intra-abdominal Procedures*

● Surgeons have keen interest in:
Avoidance of opioids
Avoidance of troughs in existing non-opioid pain med options

● *If approved, could answer needs through:*
*Relief of moderate to severe pain over 24 hours*

Hospital Outpatient & Ambulatory Surgical Settings
*Target Strategy* – *GI* and Orthopedic *Surgeons*

Hospital Outpatient Facilities
Top 426 facilities equal 50%
● *4,100 facilities with targeted GI* & Ortho (CPTs) *procedures*

Ambulatory Surgical Centers
Top 300 centers equal 50%

● *2,000 centers with targeted GI* & Ortho *procedures*

75.      On August 11, 2017, Recro filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended June 30, 2017

(the "Q2 2017 10-Q").   The Q2 2017 10-Q contained signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Henwood, Celano and Lake, stating that

the Q2 2017 10-Q *"does not contain any untrue statement of a material fact or omit to state a*

*material fact necessary to make the statements made, in light of the circumstances under*

*which such statements were made, not misleading with respect to the period covered by this*

*report."*  (Emphasis added.)

76.      In the Q2 2017 10-Q, the Company stated in relevant part (emphasis added):

Our Acute Care segment is primarily focused on developing innovative products
for commercialization in hospital and other acute care settings. Our lead product
candidate, IV meloxicam, has successfully completed two pivotal Phase III
clinical trials, a large Phase III safety trial and other safety studies for the
management of moderate to severe pain. Overall, we enrolled a total of
approximately 1,100 patients in our Phase III program. At the end of July 2017,
we submitted an NDA to the FDA for IV meloxicam 30mg for the management of
moderate to severe pain. The FDA has a 60-day filing review period to determine
whether the NDA is complete and acceptable for filing. *Our Acute Care segment*
*has no revenue and our costs consist primarily of expenses incurred in*
*conducting our clinical trials and preclinical studies, manufacturing scale-up,*
*regulatory activities, initial pre-commercialization of meloxicam and personnel*
*costs.*

77.      On August 17, 2017, the Company filed a Form 8-K with the SEC, signed by

Henwood, along with an updated corporate investor presentation, attached as an exhibit, to be

used by representatives of the Company "in various meetings with investors from time to time."

The investor presentation stated, in relevant part (emphasis added):

*IV Meloxicam Target Opportunity*

*Intra-abdominal Procedures*

17

● Surgeons have keen interest in:
    Avoidance of opioids
    Avoidance of troughs in existing non-opioid pain med options

● ***If approved, could answer needs through:***
    ***Relief of moderate to severe pain over 24 hours***
    ***Reducing LOS* [length of stay]**

78.      On September 19, 2017, the Company filed a Form 8-K with the SEC, signed by Henwood, along with an updated corporate investor presentation, attached as an exhibit, to be used by representatives of the Company "in various meetings with investors from time to time." The investor presentation stated, in relevant part (emphasis added):

### *IV Meloxicam Target Opportunity*

***Intra-abdominal Procedures***

● Surgeons have keen interest in:
    Avoidance of opioids
    Avoidance of troughs in existing non-opioid pain med options

● ***If approved, could answer needs through:***
    ***Relief of moderate to severe pain over 24 hours***
    ***Reducing LOS* [length of stay]**

79.      The statements referenced in ¶¶ 74-78 were materially false and/or misleading statements and/or failed to disclose that: (i) KOLs told the Company that the clinical data for IV meloxicam did not have a sufficient analgesic effect for soft tissue procedures and should not be used in soft tissue procedures; and (ii) Recro did not have a handle on the manufacturing process for IV meloxicam, even though KOLs had raised concerns about Sharr's qualifications and his lack of oversight of manufacturing.  As a result, the FDA ultimately rejected Recro's NDA for IV meloxicam 30 mg because it found small peaks in the drug formulation and raised concerns that the drug could extract/leach foreign particles from the vial's rubber stopper.

**Statements Issued During the Fourth Quarter of 2017 (October 1, 2017-December 31, 2017)**

80.     On October 10, 2017, Recro issued a press release entitled "Recro Pharma Presents Phase III IV Meloxicam Clinical Efficacy Data in Patients Following Abdominoplasty at the 2017 American Society of Plastic Surgeons Annual Meeting".  The press release stated, in relevant part (emphasis added):

> MALVERN, Pa., Oct. 10, 2017 (GLOBE NEWSWIRE) -- Recro Pharma, Inc. (Nasdaq:REPH), a revenue generating specialty pharmaceutical company focused on therapeutics for hospital and other acute care settings, today announced an oral presentation highlighting clinical efficacy data from its Phase III study evaluating intravenous (IV) meloxicam 30mg for the treatment of acute postoperative pain in patients following abdominoplasty surgery.  The poster was presented at Plastic Surgery The Meeting 2017, hosted by the American Society of Plastic Surgeons (ASPS), taking place October 6-10, 2017, in Orlando, FL. The poster, which was selected as a "Top 6" of the meeting, describes the clinical performance of IV meloxicam 30mg, including achievement of the study's primary endpoint, a statistically significant difference in Summed Pain Intensity Difference (SPID) over the first 24 hours (SPID24) compared to placebo, along with detailed secondary endpoints.
>
> "The Phase III results presented this year at Plastic Surgery The Meeting demonstrate the efficacy of IV meloxicam 30mg, including significant reductions in pain, as evidenced by SPID24, meaningful reductions in opioid rescue use and improvements across numerous other pain relief metrics," said Stewart McCallum, M.D., F.A.C.S., Chief Medical Officer of Recro Pharma and co-author of the poster. "On the safety front, IV meloxicam 30mg continues to demonstrate a favorable safety and tolerability profile with a low incidence of adverse events (AEs), serious AEs and infusion events.  *We believe these results demonstrate IV meloxicam 30mg's ability to provide rapid and durable pain relief following abdominoplasty surgery and support its potential to be an attractive non-opioid alternative for physicians and patients for the treatment of acute, postoperative pain*."

81.     On October 11, 2017, the Company filed a Form 8-K with the SEC, signed by Henwood, along with an updated corporate investor presentation, attached as an exhibit, to be used by representatives of the Company "in various meetings with investors from time to time." The investor presentation stated, in relevant part (emphasis added):

*IV Meloxicam Target Opportunity*

***Intra-abdominal Procedures***

● Surgeons have keen interest in:
     Avoidance of opioids
     Avoidance of troughs in existing non-opioid pain med options

● ***If approved, could answer needs through:***
     ***Relief of moderate to severe pain over 24 hours***
     ***Reducing LOS* [length of stay]**

*** *

***Targeted Accounts Cover ~12.6M Patients Across All Settings Of Care***

| ***Core Target Procedures*** | Orthopedic (Hip/Knee, Spine other) |
|---|---|
| | General Surgery |
| | ***GI/Colorectal*** |

82.    On November 9, 2017, Recro filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 10-Q"). The Q3 2017 10-Q contained signed certifications pursuant to SOX by Defendants Henwood, Celano and Lake, stating that the Q3 2017 10-Q ***"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."*** (Emphasis added.)

83.    In Q3 2017 10-Q, the Company stated in relevant part (emphasis added):

Our Acute Care segment is primarily focused on developing innovative products for commercialization in hospital and other acute care settings. Our lead product candidate, IV meloxicam, has successfully completed two pivotal Phase III clinical trials, a large Phase III safety trial and other safety studies for the management of moderate to severe pain. Overall, we enrolled a total of approximately 1,100 patients in our Phase III program. At the end of July 2017, we submitted an NDA to the FDA for IV meloxicam 30mg for the management of moderate to severe pain. The FDA has accepted the NDA for review and set a PDUFA date of May 26, 2018. ***Our Acute Care segment has no revenue and our costs consist primarily of expenses incurred in conducting our clinical***

*trials and preclinical studies, manufacturing scale-up, regulatory activities, initial pre-commercialization of meloxicam and personnel costs.*

84.     On November 14, 2017, the Company filed a Form 8-K with the SEC, signed by Henwood, along with updated information reflected in a slide presentation, attached as an exhibit, to present at the Jefferies 2017 London Healthcare Conference on November 15, 2017 and to be used by representatives of the Company "in various meetings with investors from time to time." The presentation stated, in relevant part (emphasis added):

### *IV Meloxicam Target Opportunity*

***Intra-abdominal Procedures***

● Surgeons have keen interest in:
    Avoidance of opioids
    Avoidance of troughs in existing non-opioid pain med options

● ***If approved, could answer needs through:***
    ***Relief of moderate to severe pain over 24 hours***
    ***Reducing LOS* [length of stay]**

                                        \*\*\*

***Targeted Accounts Cover ~12.6M Patients Across All Settings Of Care***

***Core Target Procedures***        Orthopedic (Hip/Knee, Spine other)
                                General Surgery
                                ***GI/Colorectal***

85.     On November 28, 2017, the Company filed a Form 8-K with the SEC, signed by Henwood, along with updated information reflected in a slide presentation, attached as an exhibit, to be used by representatives of the Company "in various meetings with investors from time to time." The presentation stated, in relevant part (emphasis added):

### *IV Meloxicam Target Opportunity*

***Intra-abdominal Procedures***

● Surgeons have keen interest in:

Avoidance of opioids
Avoidance of troughs in existing non-opioid pain med options

● *If approved, could answer needs through:*
   *Relief of moderate to severe pain over 24 hours*
   *Reducing LOS* **[length of stay]**

***

***Targeted Accounts Cover ~12.6M Patients Across All Settings Of Care***

***Core Target Procedures***      Orthopedic (Hip/Knee, Spine other)
                                  General Surgery
                                  ***GI/Colorectal***

86.     The statements referenced in ¶¶ 80-85 were materially false and/or misleading statements and/or failed to disclose that: (i) KOLs told the Company that the clinical data for IV meloxicam did not have a sufficient analgesic effect for soft tissue procedures and should not be used in soft tissue procedures; and (ii) Recro did not have a handle on the manufacturing process for IV meloxicam, even though KOLs had raised concerns about Sharr's qualifications and his lack of oversight of manufacturing.  As a result, the FDA ultimately rejected Recro's NDA for IV meloxicam 30 mg because it found small peaks in the drug formulation and raised concerns that the drug could extract/leach foreign particles from the vial's rubber stopper.

**Statements Issued During the First Quarter of 2018 (January 1, 2018-March 31, 2018)**

87.     On January 8, 2018, the Company filed a Form 8-K with the SEC, signed by Henwood, along with updated information reflected in a slide presentation, attached as an exhibit, to be used by representatives of the Company "in various meetings with investors from time to time."  The presentation stated, in relevant part (emphasis added):

***IV Meloxicam Target Opportunity***

***Intra-abdominal Procedures***

● Surgeons have keen interest in:

22

Avoidance of opioids
Avoidance of troughs in existing non-opioid pain med options

● *If approved, could answer needs through:*
   *Relief of moderate to severe pain over 24 hours*
   *Reducing LOS* **[length of stay]**

\*\*\*

*Targeted Accounts Cover ~12.6M Patients Across All Settings Of Care*

*Core Target Procedures*      Orthopedic (Hip/Knee, Spine other)
                              General Surgery
                              *GI/Colorectal*

88.    On February 7, 2018, the Company filed a Form 8-K with the SEC, signed by
Henwood, along with updated information reflected in a slide presentation, attached as an
exhibit, to be used by representatives of the Company "in various meetings with investors from
time to time." The presentation stated, in relevant part (emphasis added):

### IV Meloxicam Target Opportunity

*Intra-abdominal Procedures*

● Surgeons have keen interest in:
   Avoidance of opioids
   Avoidance of troughs in existing non-opioid pain med options

● *If approved, could answer needs through:*
   *Relief of moderate to severe pain over 24 hours*
   *Reducing LOS* **[length of stay]**

\*\*\*

*Targeted Accounts Cover ~12.6M Patients Across All Settings Of Care*

*Core Target Procedures*      Orthopedic (Hip/Knee, Spine other)
                              General Surgery
                              *GI/Colorectal*

89.    The presentation also stated that with respect to ***"Defining Our Market"***, there is
a ***"Large Addressable Patient Opportunity"*** of ***"29 Million Patients"*** for "addressable

*procedures where [the] greatest IV meloxicam use is anticipated."* It is anticipated that *"17%"* of these 29 million patients will have *"core procedures"* by *"gastrointestinal/colorectal surgeons"* involving the *"belly [and] bowel"*.  (Emphasis added.)

90.     The presentation also has sections entitled "What We Have Learned: Market Research Feedback on Clinical Profile" and "IV Meloxicam Receptivity: Anticipated Usage".  It states (emphasis added): *"In multiple market research surveys, the majority of HCP [health care professionals] surveyed said they would accept IV Meloxicam as a valuable addition upon approval to multimodal pain-management protocols.  They estimated they would use the product in ~30% of their surgical cases."*  The presentation also stated that *"core target procedures"* include *"GI/Colorectal"*.

91.     On March 2, 2018, Recro filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2017 (the "2017 10-K").  The 2017 10-K contained signed certifications pursuant to the SOX by Defendants Henwood, Celano and Lake, stating that the 2017 10-K *"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."*  (Emphasis added.)

92.     In the 2017 10-K, the Company stated in relevant part (emphasis added):

Manufacturing and Supply of our Acute Care Product Candidates

***We currently rely on contract manufacturers to produce drug product for our clinical studies under cGMPs [Current Good Manufacturing Practice regulations enforced by the FDA], with oversight by our internal managers.*** We plan to continue to rely on contract manufacturers to manufacture development quantities of our product candidates, as well as commercial quantities of our product candidates, if and when approved for marketing by the FDA. We currently rely on a single manufacturer for the clinical supplies of our drug product for each of our product candidates and do not currently have agreements

in place for redundant supply or a second source for any of our product candidates….

93.    In the 2017 10-K, the Company also stated in relevant part (emphasis added):

Our Acute Care segment is primarily focused on developing innovative products for commercialization in hospital and other acute care settings. Our lead product candidate, IV meloxicam, has successfully completed three Phase III clinical trials, two pivotal efficacy trials, large double-blind Phase III safety trial and other safety studies for the management of moderate to severe pain. Overall, the total NDA program included over 1,400 patients. At the end of July 2017, we submitted an NDA to the FDA for IV meloxicam 30mg for the management of moderate to severe pain. The FDA has accepted the NDA for review and set a PDUFA date of May 26, 2018. *Our Acute Care segment has no revenue and our costs consist primarily of expenses incurred in conducting our clinical trials and preclinical studies, manufacturing scale-up, regulatory activities, pre-commercialization of meloxicam and personnel costs.*

94.    On March 9, 2018, the Company filed a Form 8-K with the SEC, signed by Henwood, along with updated information reflected in a slide presentation, attached as an exhibit, to be used by representatives of the Company "in various meetings with investors from time to time." The presentation stated, in relevant part, that with respect to *"Defining Our Market"*, there is a *"Large Addressable Patient Opportunity"* of *"29 Million Patients"* for *"addressable procedures where [the] greatest IV meloxicam use is anticipated."* It is anticipated that *"17%"* of these 29 million patients will have *"core procedures"* by *"gastrointestinal/colorectal surgeons"* involving the *"belly [and] bowel"*. The presentation also stated that *"core target procedures"* include *"GI/Colorectal"*. (Emphasis added.)

95.    The presentation also stated the following, in relevant part, with respect to "IV Meloxicam Receptivity: Anticipated Usage" (emphasis added): *"In multiple market research surveys, the majority of HCP [health care professionals] surveyed said they would accept IV Meloxicam as a valuable addition upon approval to multimodal pain-management protocols. They estimated they would use the product in ~30% of their surgical cases."*

96.     The statements referenced in ¶¶ 87-95 were materially false and/or misleading statements and/or failed to disclose that (i) KOLs told the Company that the clinical data for IV meloxicam did not have a sufficient analgesic effect for soft tissue procedures and should not be used in soft tissue procedures; and (ii) Recro did not have a handle on the manufacturing process for IV meloxicam, even though KOLs had raised concerns about Sharr's qualifications and his lack of oversight of manufacturing.  As a result, the FDA ultimately rejected Recro's NDA for IV meloxicam 30 mg because it found small peaks in the drug formulation and raised concerns that the drug could extract/leach foreign particles from the vial's rubber stopper.

**Statements Issued During the Second Quarter of 2018 (April 1, 2018-June 30, 2018)**

97.     On May 9, 2018, Recro filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2018 (the "Q1 2018 10-Q").  The Q1 2018 10-Q contained signed certifications pursuant to SOX by Defendants Henwood and Lake, stating that the Q1 2018 10-Q ***"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."***  (Emphasis added.)

98.     In the Q1 2018 10-Q, the Company stated in relevant part (emphasis added):

Our Acute Care segment is primarily focused on developing and commercializing innovative products for hospital and related acute care settings. Our lead product candidate is a proprietary injectable form of meloxicam, a long-acting preferential COX-2 inhibitor. IV meloxicam has successfully completed three Phase III clinical trials for the management of moderate to severe pain, consisting of two pivotal efficacy trials and a large double-blind Phase III safety trial, as well as other safety studies. Overall, the total new drug application, or NDA, program included over 1,400 patients. In late July 2017, we submitted a NDA to the U.S. Food and Drug Administration, or FDA, for IV meloxicam 30mg for the management of moderate to severe pain. The FDA has accepted the NDA for review and set a date for decision on the NDA under the Prescription Drug User Fee Act, or PDUFA, of May 26, 2018. ***Our Acute Care segment has no revenue***

*and our costs consist primarily of expenses incurred in conducting our clinical trials and preclinical studies, manufacturing scale-up, regulatory activities, pre-commercialization of meloxicam and personnel costs.*

99.    On May 9, 2018, the Company's Management Team hosted an earnings call with

analysts to discuss its first quarter 2018 results.  During the earnings call, Harlow discussed its

lead product, IV meloxicam, stating in relevant part (emphasis added):

> Given the increasing urgency of the national opioid crisis, we believe IV meloxicam has to potential to serve as a valuable analgesic alternative for healthcare institutions, physicians and patients.
>
> *We believe, we've identified clear addressable segments of the market, that will benefit from IV meloxicam's profile. Segments in which we believe, IV meloxicam's profile provides both clinical and economic value.* From a clinical standpoint, we believe IV meloxicam can effectively treat pain, while reducing opioid consumption, which reduced opioid related adverse events.
>
> From an economic standpoint, we believe IV meloxicam's durable 24-hour dosing profile will allow ambulatory surgical centers to perform more complex procedures with same date discharge, while managing pain. And hospitals to accelerate patients discharge and reduce length of stay through reduction of opioids.
>
> *A pillar of our strategy is identifying the key surgeons specifically* orthopedic surgeons, general surgeons and *GI colorectal surgeons.  The procedures conducted by these surgeons represent a primary opportunity both in ambulatory surgical centers and in hospitals.*

100.    On May 10, 2018, the Company filed a Form 8-K with the SEC, signed by

Henwood, along with updated information reflected in a slide presentation, attached as an

exhibit, to be used by representatives of the Company "in various meetings with investors from

time to time."  The presentation stated that with respect to *"Defining Our Market"*, there is a

*"Large Addressable Patient Opportunity"* of *"29 Million Patients"* for *"addressable*

*procedures where [the] greatest IV meloxicam use is anticipated."*  It is anticipated that *"17%"*

of these 29 million patients will have *"core procedures"* by *"gastrointestinal/colorectal*

*surgeons"* involving the *"belly [and] bowel"*. The presentation also stated that *"core target*

*procedures"* include *"GI/Colorectal"*.  (Emphasis added.)

101.    The presentation also stated the following, in relevant part with respect to "IV

Meloxicam Receptivity: Anticipated Usage" (emphasis added): ***"In multiple market research***

***surveys, the majority of HCP [health care professionals] surveyed said they would accept IV***

***Meloxicam as a valuable addition upon approval to multimodal pain-management protocols.***

***They estimated they would use the product in ~30% of their surgical cases."***

102.    The statements referenced in ¶¶ 97-101 were materially false and/or misleading

statements and/or failed to disclose that: (i) KOLs told the Company that the clinical data for IV

meloxicam did not have a sufficient analgesic effect for soft tissue procedures and should not be

used in soft tissue procedures; and (ii) Recro did not have a handle on the manufacturing process

for IV meloxicam, even though KOLs had raised concerns about Sharr's qualifications and his

lack of oversight of manufacturing.  As a result, the FDA ultimately rejected Recro's NDA for

IV meloxicam 30 mg because it found small peaks in the drug formulation and raised concerns

that the drug could extract/leach foreign particles from the vial's rubber stopper.

**The Truth Begins to Emerge**

103.    On May 24, 2018, Recro issued a press release entitled "Recro Pharma Receives

Complete Response Letter from the FDA," disclosing that the FDA had declined to approve

Recro's New Drug Application for IV meloxicam (the "May 24, 2018 Revelation").  In the press

release, the Company stated in relevant part (emphasis added):

> **MALVERN, PA, May 24, 2018** – Recro Pharma, Inc. (Nasdaq: REPH), a
> revenue generating specialty pharmaceutical company focused on therapeutics for
> the hospital and other acute care settings, today announced it has received a
> Complete Response Letter (CRL) from the U.S. Food and Drug Administration
> (FDA) Office of Drug Evaluation II regarding the New Drug Application (NDA)
> for IV meloxicam.

The CRL stated that although the outcome of the pivotal phase III trials demonstrated statistically significant outcomes on the primary endpoints, ***the FDA is unable to approve the application in its current form. The CRL states that data from ad hoc analyses and selective secondary endpoints suggest that the analgesic effect does not meet the expectations of the FDA. In addition, the CRL raised CMC [or Chemistry, Manufacturing and Controls]-related questions on extractable and leachable data provided in the NDA.***

104.    On this news, Recro's share price fell $6.79, or 54.67%, to close at $5.63 on May 24, 2018.

105.    The May 24, 2018 Revelation disclosed for the first time what Defendants had been told by KOLs and concealed all along – that the clinical data for IV meloxicam suggests that the drug did not have a sufficient analgesic effect.  Recro knew that KOLs told the Company that they were not impressed with the drug's analgesic effect for soft tissue procedures and it should not be used in soft tissue procedures, which directly contradicts many of Recro's statements regarding the market and usage for IV meloxicam.

106.    The May 24, 2018 Revelation also disclosed for the first time that Recro did not have a handle on the manufacturing process, even though KOLs had raised concerns earlier about Sharr's qualifications and his oversight of manufacturing overseas, which Recro failed to disclose.  The FDA saw small peaks in the drug formulation and raised concerns that the drug could extract/leach foreign particles from the vial's rubber stopper.  This corrective disclosure directly contradicts Recro's prior statement that its internal managers had oversight of the overseas manufacturing process for IV meloxicam.

107.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

108.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Recro securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

109.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Recro securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Recro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

110.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

111.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

112.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Recro;

- whether the Individual Defendants caused Recro to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Recro securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

113.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

114.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Recro securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Recro securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

115.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

116.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

117.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

119.   During the Class Period, Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Recro securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Recro securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

120.   Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Recro securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Recro's business prospects.

121.   By virtue of their positions at Recro, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants

33

were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

122.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.    As senior officers/executives of Recro, the Individual Defendants had knowledge of the details of Recro's internal affairs.

123.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Recro.  As officers/executives of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Recro's businesses, operations, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Recro securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Recro's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Recro securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

124.    During the Class Period, Recro securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Recro securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Recro securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Recro securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

125.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

126.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure of the truth to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

127.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

128.    During the Class Period, the Individual Defendants participated in the operation and management of Recro, and conducted and participated, directly and indirectly, in the conduct of Recro's business affairs.  Because of their senior positions, they knew about the adverse non-public information with respect to which Plaintiff and the other members of the Class complain.

129.    As officers and/or executives of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Recro's financial condition and results of operations, and to correct promptly any public statements issued by Recro which had become materially false or misleading.

130.    Because of their positions of control and authority as senior officers/executives, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Recro disseminated in the marketplace during the Class Period concerning Recro's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Recro to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Recro within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Recro securities.

131.    Each of the Individual Defendants, therefore, acted as a controlling person of Recro.  By reason of their senior management positions of Recro, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Recro to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of Recro and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

132.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Recro.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 10, 2018

Respectfully submitted,

*/s/ D. Seamus Kaskela*
D. Seamus Kaskela

**KASKELA LAW LLC**
D. Seamus Kaskela (PA Bar No. 204351)
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Telephone: (484) 258–1585
Facsimile: (484) 258–1585
Email:  skaskela@kaskelalaw.com

***Liaison Counsel for the Proposed Class***

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016

Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email:  jalieberman@pomlaw.com
bszydlo@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Counsel for Lead Plaintiff and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Additional Counsel for the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ D. Seamus Kaskela
D. Seamus Kaskela